**SIGNED this 07th day of February, 2008.**

_____
**FRANK R. MONROE**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | X | CASE NO. 06-11933-FRM |
| GENEVA PETERSON BERG | X | |
| | X | CHAPTER 7 |
| DEBTOR | X | |
| | X | |

MEMORANDUM OPINION

The Court held a hearing on August 21, 2007 on the Chapter 7 Trustee's Motion to

Reconsider Order Approving Trustee's Application to Sell Property (a Royalty Interest in Wise

County, Texas). Geneva Peterson Berg ("Debtor") joined in the Trustee's Motion to Reconsider and

a Response was filed by B-29 Investment, L.P. After the hearing, the Court took the matter under

advisement and requested additional briefing from the parties. This Court has jurisdiction to

reconsider its orders pursuant to Fed. R. Civ. P. 59(e) made applicable herein through Fed. R. Bankr.

P. 9023 which applies to requests to amend judgments/orders filed no later than ten (10) days after

entry of the judgment/order in question. This Memorandum Opinion constitutes Findings of Fact

1

and Conclusions of Law as required by Bankruptcy Rule 7052 which is made applicable to contested matters under Bankruptcy Rule 9014.

Statement of Facts

The Debtor initiated this case by filing a voluntary Chapter 7 petition on November 29, 2006. C. Daniel Roberts is the duly appointed Chapter 7 Trustee (the "Trustee"). The Debtor scheduled a non-exempt royalty interest in Wise County, Texas with a scheduled value of $6,987.00 (the "Royalty Interest"). HEP Oil Company, Ltd. ("HEP") leased 168 acres known as the "Berg Lease" and operated a well known as the Berg No. 2. HEP paid royalties to the Debtor based on production from the Berg No. 2. Testimony at the creditor's meeting was that there had been past production from the land covered by the Royalty Interest, but that the well had recently stopped producing. The Debtor's answer to the Statement of Financial Affairs question 1 indicates that Debtor received $233.00 per month from the Royalty Interest in 2006. Debtor provided the Trustee with no other information regarding the Royalty Interest.

On January 18, 2007, Debtor's counsel made an offer on behalf of Debtor to purchase the Royalty Interest for $3,000.00. On or around May 31, 2007, the Trustee contacted a representative of the operator of the well, HEP. The Trustee testified that he told the representative, whose name he believed to be "Missy", that he was investigating the value of a royalty interest scheduled by Ms. Berg. The Trustee then talked with Tom Bollins [or Bowens] of HEP who indicated that the well was not producing but that HEP intended to put the well on a pump and re-establish production to prior levels. Mr. Bollins suggested that the Trustee talk further with Mr. John Schmitz, an officer of the general partner of HEP.

At that time, the Trustee was under the impression that the only production from the Berg Lease,  and the only possible source of royalty income, was from the Berg. No. 2 well operated by HEP.  The Trustee had done no other independent investigation regarding the Royalty Interest prior to talking to Mr. Schmitz.

On May 31, 2007 the Trustee talked with Mr. Schmitz, who the Trustee understood to be a representative of  HEP[1] in some then unknown capacity.   The Trustee testified that he explained to Mr. Schmitz that he was the Chapter 7 Trustee, that Ms. Berg had scheduled the Royalty Interest and that he was interested in confirming whether or not there was any production from the interest.  Mr. Schmitz confirmed that the well was being reworked.  The Trustee then asked what Mr. Schmitz estimated annual production would be from the Royalty Interest after the well was reworked.  Mr. Schmitz indicated that he expected to have revenue of approximately $1,260.00 per year from oil production and approximately $4,000.00 per year from natural gas production, for a total of $5,260.00 per year. The Trustee testified that Mr. Schmitz indicated he was interested in purchasing the interest.  The Trustee indicated that he normally received five months of actual production (this is what the transcript says but the Court believes he meant five times annual production).  Mr. Schmitz offered $17,500.00 and the Trustee countered with $25,000.00. Mr. Schmitz indicated that was more than he normally paid but he would be willing to pay the  $25,000.00 which was about five times his estimate of production from the Berg well.   The Trustee testified that he asked Mr. Schmitz why he would be willing to pay that much for a well that was not producing and a Royalty

---

[1]As it turns out, Mr. Schmitz is a 90% limited partner of B-29 Investments, L.P.  B-29 Investments, L.P. is a 34% limited partner of HEP Oil Company, Ltd..  Mr. Schmitz is also the President of HEP Management, Ltd., the general partner of HEP Oil Company, Ltd. Mr. Schmitz used B-29 Investments, L.P. as the purchaser, instead of HEP Oil Company, Ltd., because B-29 Investments, L.P. traditionally held the royalty interests acquired by Mr. Schmitz.

Interest that had no production on it, and Mr. Schmitz indicated that, for accounting purposes, it was easier for HEP to buy out smaller interests for more than the fair market value in order to eliminate those smaller interests and not have to keep up with production attributable to them. *Transcript Page 32-33*. The Trustee testified at the hearing that when he contacted HEP, there was no doubt in his mind that he was inquiring about the facts pertaining to the Royalty Interest and not just the Berg No. 2 well even though that was the only well he was then aware of.

The Trustee accepted the offer of $25,000.00 subject to Bankruptcy Court approval. He then filed an Application to Sell the interest on June 5, 2007. The Debtor objected to the sale and offered to pay $25,500.00.

On July 3, 2007, the Court held a hearing on the Application to Sell, and the Court authorized the Trustee to conduct an auction between the two interested parties, B-29 Investments, L.P. ("B-29") and the Debtor. On July 5, 2007, the Trustee conducted the auction. Both the Debtor and B-29 bid. The Trustee sold the interest to B-29 for $34,000.00 as the highest bidder. B-29 forwarded to the Trustee a cashier's check in the amount of $34,000.00 in payment of the Royalty Interest. The Court entered the Order approving the sale on July 9, 2007 (the "Sale Order"), four (4) days after the auction. The Trustee transferred the Royalty Interest to B-29 by executing the Mineral and Royalty Deed that same day.

On July 12, 2007, three (3) days after finalizing the sale, the Trustee received a production check forwarded by the Debtor in the amount of $10,190.80. This check was dated July 9, 2007 issued by Joint Resources Company ("JRC") for production for the month of May, 2007 from wells known as the Berg 1A and Berg 2A. Upon, further investigation, the Trustee learned that HEP had actually farmed out the underlying lease to JRC, another operating company, who had begun

4

drilling two new wells in late 2006 which were completed in April and May 2007. The check for $10,190.80 was for one month of production from the Berg 1A and one/half of a month production from the Berg 2A. The production from the two new wells alone would indicate a value of from $180,000.00 to in excess of $300,000.00 for the Debtor's Royalty Interest. The Trustee has since received an additional check dated August 24, 2007 for $14,090.04.

The Debtor testified at the hearing that she had been willing to pay more than the original offer of $3,000.00 because she had a large sentimental value to the property, and she wanted to retain it and give it to her sons. She claims she had no idea it was actually worth more. However, the Debtor did testify that on June 11, six days after the Trustee filed the Application to Sell, she called a man, Mr. Pollard, who buys mineral interests[2] and explained to him that "I feel like they know something I don't know." *Transcript Page 17.* Mr. Pollard evidently investigated and was able to provide her with information regarding certain new drillings on the Berg Lease but was not encouraging that these would be productive wells. Mr Pollard provided no other information. *Transcript Page 17.* The Debtor did not investigate further; nor did she disclose this information to the Trustee. The Debtor also testified that she had not received any other information regarding any new drilling from HEP.

Mr. Schmitz testified that he knew at the time he offered to purchase the Royalty Interest that there was a farm out agreement between HEP and JRC (HEP having farmed out most of the undeveloped acreage under the Berg Lease to JRC) and that he knew that JRC had drilled two new wells on the property. He testified at trial that he did not know what the production on those wells, if any, would be although he did know that if there was production under the new wells, the Royalty

---

[2]A friend had given her the name of this man, Ray Pollard, who buys mineral interests.

Interest would become more valuable.   He could not recall a specific date of when he actually knew that the wells were capable of production, but he did execute for HEP an Assignment of oil and gas lease on June 29, 2007 thereby assigning to JRC  HEP's working interests (reserving any overriding royalty interests and royalty interests of record to HEP).   This assignment was to occur once production was established on the two JRC wells.  Plus,  HEP had  participated in the drilling of the two wells through its working interest which required HEP to pay the bills that were proportionate to the interest it owned.

Mr. Schmitz testified at trial that the Trustee did not ask him specifically about the value of the Royalty Interest over the entire 168 acres.  He testified that the conversation started with the production income from the Berg No. 2 well being the only production income at that point and what had happened to the well and why production decreased.  Mr. Schmitz indicated that he explained to the Trustee that the well was shut in because it had been fractured into by an offset well and that HEP intended to rework the well and reestablish production.   Mr. Schmitz stated that the Trustee did not ask any questions about the offset well, the existence of any farm out agreement or whether other wells were being drilled on the lease.  Mr. Schmitz explained that had the Trustee asked any questions about the offset well, the farm out, or about other wells that had been drilled on the property that he would have told the Trustee about such.

Mr. Schmitz also testified that the Trustee asked him if he was willing to buy the Royalty Interest.  Mr. Schmitz said he would purchase such for $17,500.00.  The parties negotiated and agreed on a final price of $25,000.00.  On cross Mr. Schmitz explained that the Trustee's questions had to do with the Royalty Interest and not the actual mineral interest which he explained, in his mind, was a big difference.  A royalty interest, however,  produces income out of production from

6

the entirety of the lease, not just one well; and, its value is a function of total production under the lease, not just the production from one well.  This is something that Mr. Schmitz, an experienced oil and gas businessman, was well aware of.

Additionally,  Mr Schmitz adamantly testified that the purpose of the Trustee's call, as he remembered it, was to ask how he would value the Royalty Interest and what he would be willing to pay for it.   Mr Schmitz states, "Your questions was what I was willing to pay for the royalty interest, how I valued it, and then you said, 'I usually get five years.' What I just explained to you drilling 12 month royalty that I offered you 3 ½ years and you said, 'Will you be willing to give $25,000.00 for it?' and I said yes." *Transcript 103-104.*  Mr. Schmitz believed the conversation to be  that the Trustee asked about the interest in the trailing 12 months–the royalty interest income and the trailing history of the production value of the royalty for this mineral interest in the past. *Transcript 104.*  However, it is clear from this testimony that Mr. Schmitz knew the Trustee wanted to know how he would value the entirety of the Royalty Interest.  Also, the Court believes Mr. Schmitz most probably knew by May 31 that the other two wells drilled on the lease by JRC were producing since HEP was a working interest owner in them and had been paying its share of the drilling costs of those two wells which had been completed, one in April, one in mid-May.  Further, it is clear that Mr. Schmitz omitted any reference to them in coming to his estimate of value for the entire Royalty Interest when he talked to the Trustee on May 31.   Instead, when asked why he would pay that much for a royalty interest with a currently non-producing well, Mr. Schmitz told the Trustee that it was, for accounting purposes, easier to buy out smaller interests and not have to keep up with the record keeping.  At best, Mr. Schmitz's answer to the Trustee was disingenuous.  At worst, it was intentionally misleading.  Mr. Schmitz claimed on cross that he did not <u>believe</u> that

the Trustee asked him about existing production on the Royalty Interest but when asked again if he disagreed that the Trustee asked about production from the Royalty Interest, he indicates–"I don't know if that's what you answered [asked], I didn't listen too good." *Transcript 104*.

It is undisputed that  the Trustee was unaware that HEP had farmed out the lease to JRC, that JRC had drilled two new wells on the property that had been completed and begun production and that the royalty revenue could realistically be expected to be significantly greater than the Trustee believed based solely upon what Mr. Schmitz told him about the Berg No. 2 well.

The Trustee claims that the foregoing, together with the Royalty check he received July 12, is newly discovered evidence, of which he was unaware prior to the sale and that the Sale Order entered approving the sale to B-29 should be set aside.  The Trustee further claims that Mr. Schmitz, who was an owner of B-29, and a representative of HEP, withheld information he knew regarding the farm out to JRC which prevented the Trustee from obtaining market value for the interest.  The Trustee contends that Mr. Schmitz had a duty to disclose such information to the Trustee and because of this misconduct, the Sale Order should also be set aside.  Basically, the Trustee argues the Sale Order should be set aside on the grounds of newly discovered evidence or to prevent a manifest injustice of an inequitable windfall to B-29 and to allow the Royalty Interest to be sold at its fair market value for the benefit of the Debtor's creditors and the bankruptcy estate.  However, the Trustee also testified that with the recent monthly royalty checks from the Berg 1A and 2A production, if similar checks continued, he could easily pay all the Debtor's creditors in full within six or seven months and be able to return the Royalty Interest to the Debtor as this would now be considered an excess funds case.

B-29 claims that a prospective purchaser of assets has no duty, fiduciary or otherwise, to

8

volunteer information which the Trustee never requested and which was equally available to the Trustee had he chosen to investigate further and which he should have independently investigated rather than merely making inquiries regarding the Debtor's Royalty Interest to Mr. Schmitz.  B-29 further claims that Mr. Schmitz did not mislead the Trustee about anything.   B-29 claims that Mr. Schmitz's testimony revealed that (i)  he answered truthfully and fully all questions which the Trustee asked of him, (ii)  he never misled the Trustee in any of his answers to the Trustee's question, (c) what he told the Trustee was in response to questions asked of him by the Trustee in negotiations over the Trustee's sale of the Royalty Interest, not voluntary or gratuitous disclosures by Mr. Schmitz, (d)  the Trustee failed to ask numerous questions, (e) had the Trustee asked such questions he would have answered those questions truthfully and fully as well, and (vi)  answers to all questions which the Trustee failed to ask were of public record and readily available to anyone who exercised a minimum amount of diligence.

## Question Presented

Should the Sale Order authorizing the sale of the Debtor's royalty interest to B-29 Investments, L.P. entered on July 9, 2007 be set aside?

## Conclusions of Law

This motion will be treated as a motion for reconsideration under Fed. R. Civ. P. 59(e). *See Fletcher v. Apfel,* 210 F.3d 510, 511-12 (5th Cir. 2000)("A motion to reconsider which challenges a prior judgment on the merits will be treated as a Federal Rule of Civil Procedure 59(e) motion if it is served within ten days after entry of the judgment."). "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet v. Hydrochem Inc.,* 367 F.3d 473, 479 (5th Cir. 2004).  The Fifth Circuit has held "that such a motion is not the proper

vehicle for rehashing evidence, legal theories or arguments that could have been offered or raised before the entry of judgment." *Templet*, 367 F. 3d at 479; *Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir. 1990).  Rather Rule 59(e) "serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Templet*, 367 F.3d at 479.

However, a motion to reopen a case under Rule 59(e) though subject to much more stringent time limitations than a comparable motion under Rule 60(b), is not controlled by the same exacting substantive requirements.  *See Smith v. Morris & Manning,* 657 F.Supp. 180, 181 (S.D.N.Y. 1987). Because rule 59(e) motions are subject to much more stringent time requirements than Rule 60(b) motions, Rule 59(e) motions provide relief for the movant on grounds at least as broad as Rule 60 motions.  *See Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, *see also Smith v. Morris & Manning,* 657 F.Supp. 180, 181 (When filing a motion under Rule 59(e), "[a party] need not meet the somewhat stringent requirements of Rule 60, which is aimed at protecting the finality of judgments from belated attack.").  Rule 59(e), therefore, provides district courts with the power to consider equitable factors and provide relief for "any . . . reason justifying relief from the operation of the judgment." *See* Fed. R. Civ. P. 60(b)(6); *see also Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 863-64, 108 S.Ct. 2194, 100 L.Ed. 2d 855 (1988)(noting that Rule 60(b)(6) provides district courts with "authority adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," but that such power should only be used in extraordinary circumstances."(internal quotations omitted).

In addition to the less stringent requirements as a Rule 59(e) motion, this particular case provides a unique situation.  This is not litigation between a plaintiff and defendant based on alleged causes of action.    This is B-29's purchase of a Royalty Interest from the Trustee of the Debtor's

10

bankruptcy estate pursuant to court order whereby the Trustee in turn distributes the proceeds therefrom to the creditors of the Debtor's bankruptcy estate.

B-29 argues that it is rare to disturb a sale order in bankruptcy.  B-29 is correct that of great importance to smooth and correct judicial administration is the general policy which emphasizes the stability of judicial sales.  As such, there is reluctance to set aside confirmed sales as there is a desire to promote finality.  As one court has stated: "[i]f parties are to be encouraged to bid at judicial sales, there must be stability in such sales and a time must come when a fair bid is accepted and the proceedings are ended."  *In re Webcor,* 392 F2d 893, 899 (7th Cir. 1968) *cert. denied* 383 U.S. 837, 89 S.Ct. 113, 21 LEd2d 107 (1968).

However, "balancing that, it is of overwhelming importance that the rights of creditors in a concern in bankruptcy should be protected and that a disposal of property on terms which violate this rule should not be permitted to stand."  *Procter & Gamble Mfg. Co. v. Metcalf,* 173 F2d 207, 209 (9th Cir. 1949).  Thus, "[w]here there are even slight circumstances which suggest that there is unfairness to the estate in bankruptcy, a careful consideration should be had on review and a confirmed sale should be set aside if necessary to rectify the situation."  *Id.*  at 209.

Further, the Sales Order was stayed until the expiration of ten (10) days after the entry of the order.   Fed. Rule of Bankr. P. 6004(g).  Here, however, B-29 and the Trustee proceeded to close the sale prior to the Sale Order being final.  The auction occurred July 5, 2007, and the Court entered the Sale Order on July 9, 2007 meaning the Sale Order would not be final until July 19, 2007.  The Trustee and B-29 closed the transaction July 9, 2007.  The Trustee then filed his Motion to Reconsider on July 16, 2007 well within the ten (10) days of the Sale Order being final.

11

Additionally unique to our situation, is that Mr. Schmitz is not only an owner of an interest in B-29, the purchaser, he is also an officer of the general partner operating HEP, the operator of the Berg No. 2. The Court takes these facts into consideration while reviewing the Motion to Reconsider.

<u>Newly Discovered Evidence</u>

Unlike Rule 60(b), Rule 59(e) does not set forth any specific grounds for relief. Nor does the 5th Circuit discern any basis for engrafting the strict limitations of the former onto the latter. Therefore, the 5th Circuit has concluded that in order to reopen a case under Rule 59(e) on the basis of evidentiary materials that were not timely submitted, the mover need not first show that her default was the result of mistake, inadvertence, surprise or excusable neglect or that the evidence is such as to show that the judgment is manifestly wrong. *Lavespere v. Niagara Machine & Tool Works, Inc.* 910 F.2d 167 (5th Cir. 1990).

In *Lavespere*, the 5th Circuit recognized that while a district court has considerable discretion in deciding whether to reopen a case in response to a motion for reconsideration, such discretion is not limitless. 910 F.2d 174. There are two important judicial imperatives relating to such a motion: 1) the need to bring litigation to an end; and 2) the need to render just decisions on the basis of all the facts. *Id.* (citations omitted). The task for the district court is to strike the proper balance between these competing interests. *Id.*

In *Lavespere,* the 5th Circuit considered four factors in concluding that the motion to reconsider should be granted. These factors include: 1) the reasons for the moving party's default; 2) the importance of the omitted evidence to the moving party's case; 3) whether the evidence was available to the non-movant before it responded to the summary judgment motion; and 4) the

12

likelihood that the non-moving party will suffer unfair prejudice if the case is reopened. *Id.* at 174.'

B-29/Schmitz claims that all four factors favor denying the Motion to Reconsider in this situation.  First and foremost B-29 claims that an unexcused failure to present evidence available at the time of the judgment provides a valid basis for denying a subsequent motion for reconsideration citing *Templet v. Hydrochem, Inc.* 367 F.3d 473, 479 (5th Cir. 2004)(citing *Russ v. Int'l Paper Co.,* 943 F.2d 589, 593 (5th Cir. 1991).  The Court agrees that this can be a valid basis for denying a Motion for Reconsideration but it is not the sole factor for denying a motion and it is not determinative of the issue by itself.  *See Lavespere* where the 5th Circuit held that a court could consider new evidentiary material (which was not newly discovered) submitted with a motion for reconsideration of a summary judgment which was filed within two (2) days after the grant of the summary judgment.  All factors must be viewed together for the court to strike the proper balance between ending litigation and the need to render a just decision on the basis of all the facts.

In the Motion to Reconsider, the Trustee claims that the following was "newly discovered evidence" which justifies setting aside the Sale Order:

> (i) that, in addition to the Berg No. 2  well which was operated by HEP, the Berg 1A and 2A wells had been drilled and completed on the Berg Lease;

> (ii) that JRC was the operator of the Berg 1A and 2A wells;

> (iii) that the Berg Lease had been farmed out by HEP to JRC; and

> (iv) that the anticipated production from the Berg 1A and 2A wells evidence a  much higher value for the Royalty Interest than the $34,000.00 price accepted and approved by the Sale Order.

1) Reasons for the Trustee's default:

 B-29 claims that the Trustee is at fault due to his failure to check the public records of the Texas Railroad Commission with regard to this asset prior to the entry of the Sale Order which

investigation would have disclosed to the Trustee certain of the facts concerning the Royalty Interest and its value that he now claims as "newly discovered." Further, B–29 asserts that the Trustee failed to ask Mr. Schmitz questions that would have allowed him to discover the farm out and the additional wells. The evidence supports a finding that the Trustee did not search the Texas Railroad Commission records or ask Mr. Schmitz questions as to whether any farm out or other wells existed on the lease. However, the Trustee began his initial investigation with respect to this Royalty Interest (other than discussions with the Debtor) by talking to Mr. Schmitz on May 31 after the two new wells drilled by JRC had begun producing. Specifically, the Trustee called HEP, the operator of the Berg No. 2 well, three times to inquire about the Royalty Interest. The third time he talked to Mr. Schmitz, the party to whom he had been directed as a result of the first two calls. The Trustee believed that Mr. Schmitz knew that he, the Trustee, was seeking information on the value of the <u>future</u> <u>production</u> from the Royalty Interest as he asked him his opinion of the Royalty Interest's value. Mr. Schmitz testified that he thought the Trustee was inquiring about the value of the Royalty Interest based solely upon the well for which HEP was the operator since the Trustee's questions were limited to that. Therefore, Mr. Schmitz says he limited his discussion to the reworking of the Berg No. 2. Mr. Schmitz's testimony on this point, however, was not consistent. At one point he admits the Trustee asked him about how he would value the Royalty Interest; at another point he claims he's not sure that the Trustee asked him because, "I didn't listen too good." And, at another, he states that he thought the Trustee was asking about the Berg No. 2 only. In any event, whatever was said, it is clear that the Trustee was left with the impression that the only source of such income from the Royalty Interest was HEP's Berg No. 2 well, and based on that he reasonably decided to investigate no further. As such, he offered the Royalty Interest to Schmitz; and Schmitz, in his

14

capacity as a limited partner of B-29 struck a deal.  The Trustee wins this point.

2) <u>The importance of the omitted evidence</u>

The omitted evidence is very important.  The evidence presented reflects that the Royalty Interest is worth significantly more than the $34,000.00 paid by B-29.  The Trustee testified that if the Sale Order is set aside, based on the recent royalty checks, he could retain the interest for five or six months, pay all the creditors of this bankruptcy estate in full and then return the Royalty Interest to the Debtor as this would be an excess funds case.  B-29 claims that this should not be at the expense of B-29 because it participated in an auction and submitted the highest offer  approved by the Court.  B-29 urges such higher value should be paid by the Trustee's bond since he failed to conduct proper due diligence and that this factor still favors denial.  The fact is that if the Sale Order is not overturned,  the creditors of this bankruptcy estate will not be paid in full and the Debtor will receive nothing.  The existence of the Trustee's bond is a red herring.  Had the unknown evidence been known, the sale would never have been approved.  The Trustee wins this point as well.

3) <u>whether the evidence was available to the Trustee before the Court entered the Sale Order</u>

The evidence introduced by B-29 at trial demonstrated  the contents of the Texas Railroad Commission records that were available to the Trustee prior to the July 5 auction and entry of the Sale Order on July 9, 2007.  Forms W-1, W-2, W-12, W-15,  P-4 and P-8 reflect  the information available at the Texas Railroad Commission which was reviewable online at the Commission's website.  *See B-29's Exhibits  D-12, D-13 and D-14.*  There are two Applications for Permit to Drill (one for the Berg 1A well and one for the Berg 2A) that were filed by JRC in November of 2006.  These Applications show JRC as the operator and name the lease as the Berg Lease with minimal legal description.   There is, however,  no information regarding HEP anywhere on these

Applications. The remaining forms were also filed by JRC in connection with its well completions on the Berg 1A and 2A but these were filed in April and May of 2007.

The farm out from HEP to JRC is not evident from the Railroad Commission forms. And, an Assignment of Oil and Gas Lease(s) reflecting the assignment of the Lease from HEP to JRC[3] was not filed in the real property records until June 29, 2007, five (5) days prior to the auction and one month after the Trustee and Mr. Schmitz talked. And, of course, Mr. Schmitz signed this Assignment as the President of HEP Management, LLC, the general partner of HEP Oil Company, Ltd.

The Trustee could have asked Mr. Schmitz (ii) if there was any undrilled acreage on the Berg Lease, (ii) if there had been any farmout or assignment of such acreage, and if so to whom and (iii) if there had been any subsequent drilling and completion of wells on such acreage. He did not. And, although Mr. Schmitz testified at trial that he would have gladly shared this information with the Trustee had he asked, his testimony as noted above is not consistent. And, as noted above, Mr. Schmitz knew the Trustee was inquiring about the value of the Royalty Interest on the entire lease. "Your question[s] was what I was willing to pay for the royalty interest, how I valued it, . . ." *Transcript Pg. 103.* But Mr. Schmitz did not share the information about the two wells JRC had just completed in April and May even though HEP then owned a working interest in them and, at the time of his conversation with the Trustee, Mr. Schmitz had to have known that they were in full production.

The Court agrees that some of this evidence was available prior to the entry of the Sale Order. However, the Texas Railroad Commission records do not reflect the magnitude of the revenue that would be earned by the Debtor's Royalty Interest. And, Mr. Schmitz was less than

---

[3]An assignment is only filed once the farmee's wells actually produce oil and gas.

candid in his conversation with the Trustee.  Further, the two royalty checks, one for $10,190.80 from May production on the two JRC wells received July 12, 2007 and the second for $14,090.04 dated August 24, 2007, constitute additional evidence to support the Motion to Reconsider.  The Trustee wins this point too.

    4)  <u>the likelihood that B-29/Schmitz will suffer unfair prejudice if the Sale Order is set aside</u>

Last, B-29 claims that setting aside the Sale Order will unfairly prejudice it.  B-29 argues that if the Sale Order is set aside, then such will be the second time in this case.[4]  B-29's initial offer of $25,000.00 was accepted by the Trustee but never approved by the Court due to the Debtor's objection which then forced the Debtor and B-29 into an auction.  B-29 claims that if the Sale Order is set aside again, B-29 is out a second time.  B-29 claims this will not end.[5]  Further, B-29 claims it has incurred significant legal fees and expenses in dealing with this second challenge, which fees will only increase if the Sale Order is set aside, further unfairly prejudicing B-29.  Further, setting aside the Sale Order, followed by a forced second auction, may result in B-29 having to pay substantially more for a Royalty Interest than it has already purchased in a properly conducted auction sanctioned by the Court.

B-29, however, is not an innocent third party in the deal. Mr Schmitz controls both HEP and B-29.  He knew that there was a farm out agreement to JRC from HEP and knew that JRC had completed  two wells on the property in April and May as HEP owned a working interest in them. He claims he does not know when he knew about any production from the new wells.  If that is true,

---

[4]   This is simply untrue.  No order was ever entered on the Trustee's acceptance of this offer since the Debtor objected and bid more.  This is standard in bankruptcy Trustee sales.

[5]   The Court construes this as the "t'aint fair" argument.

then the existence of production from the two JRC wells is, in fact, newly discovered evidence as

the Trustee claims since if Mr. Schmitz didn't know about it, how could the Trustee be expected to

know about it. However, Mr. Schmitz was intimately acquainted with the Berg Lease and he knew

that if the two new wells produced, it could be of potential substantial benefit to the value of the

Royalty Interest. The Court believes that Mr. Schmitz knew, as the prospective purchaser through

B-29, and as the President of the general partner of HEP, that there was production from these new

wells on May 31 when he talked to the Trustee.

Vacating the Order would require that B-29 be placed in the position it occupied before the

sale. To do so would require that it receive back the $34,000.00 it paid plus be able to make a claim

for reasonable attorney's fees. The Court cannot say that B-29 is unfairly prejudiced. Vacating the

Order will, in fact, keep B-29 from realizing a substantial windfall at the expense of the estate's

creditors and the Debtor. Additionally, the Trustee brought this Motion to Reconsider prior to the

Sale Order being final. B-29 closed this transaction early at its own peril. Had the parties not

attempted to close the transaction until the Sale Order became final, we would not be here today.

The Trustee is now four for four.

<u>Manifest Injustice</u>

The Trustee asserts that B-29/Schmitz/HEP knew the Trustee was seeking information on

the value of the future production from the Royalty Interest, [which would, as matter of black letter

law include all sources of production under the lease], knew that the Trustee believed that the only

source of such income was HEP's Berg No. 2 well, and knew, at a minimum, that there was a very

real possibility of substantial royalty income arising from the JRC farm out agreement about which

the Trustee was unaware. The Trustee urges that B-29 at a minimum was aware of or on notice of

the Trustee's mistaken belief, and in actuality, caused the mistake by failing to provide the

18

additional information on the farm out agreement, whether such was done purposefully, carelessly or innocently.  In light of this the Trustee argues that the Sale Order should also be set aside due to manifest injustice.

Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Templet* citing *Waltman v. Int'l Paper Co.,* 875 F.2d 468 (5th Cir. 1989).  B-29 argues that these are the only standards by which the Sale Order can be set aside and neither exist.  However, at least one Fifth Circuit opinion acknowledges a district court's holding that the defendants failed to establish any of the grounds for granting a motion for reconsideration under Rule 59(e) those grounds being (1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or prevent manifest injustice.  *See, In re Benjamin Moore & Co.,* 318 F.3d 626, 629 (5th Cir. 2002).  And regardless, Rule 59 establishes a lower threshold than Rule 60.  Federal Rules of Civil Procedure 60(b) provides a procedure whereby, in appropriate cases, a party may be relieved of a final judgment.  In particular, Rule 60(b)(6) grants federal courts broad authority to relieve a party from a final judgment for "any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(6).  The Rule does not particularize the factors that justify relief, but provides courts with  "authority adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," *Klapprott v. United States,* 335 U.S. 601, 614-615, 69 S.Ct. 384, 390, 93 L.Ed 266 (1949), while also cautioning that it should only be applied in "extraordinary circumstances." *Ackermann v. United States,* 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 91950).  It bears then if a court can cure a miscarriage of justice under the stringent requirements of Rule 60(b), then a court should be able to do  the same  under the less stringent requirements of Rule 59(e).

In response to the Trustee's argument B-29 claims that he is wrong on two counts-(1) B-29

19

did not mislead the Trustee about anything and (2) B-29, a prospective purchaser of estate assets, had no duty to volunteer information which the Trustee never requested, which was equally available to the Trustee, and which the Trustee had an independent duty to investigate.

Mr. Schmitz consistently testified that (i) he answered truthfully and fully all questions which the Trustee asked of him, (ii) he never misled the Trustee in any of his answers to the Trustee's questions (iii) what he told the Trustee was in response to questions asked of him by the Trustee in negotiations over the Trustee's sale of the Royalty Interest, not voluntary or gratuitous disclosures by Mr. Schmitz, (iv) the Trustee failed to ask questions about other activity on the Berg Lease (v) that had the Trustee asked such questions, he would have answered those questions truthfully and fully as well, and (vi) answers to all questions which the Trustee failed to ask were of public record and readily available to anyone who exercised the minimum amount of due diligence.

However, as noted above, Mr. Schmitz's testimony was anything but consistent on the issue of whether the Trustee asked him his opinion of the entirety of the Royalty Interest, a point about which the Trustee was clear and consistent. Further, even if there may be no duty for B-29 to have disclosed information on the two JRC wells, the conversation began with Mr. Schmitz speaking on behalf of HEP, the operator of the only well that was known to the Trustee and the entity that had farmed the lease out to JRC. Further, Mr. Schmitz knew the two new JRC wells were producing at the time of his conversation with the Trustee, a fact the Trustee could not have reasonably been expected to know. And, based on the substance of their conversation, the Court does not believe the Trustee was required to investigate further. Based upon what was said, the Court believes the Trustee was justified in relying on what Mr. Schmitz told him as the controlling person of HEP.

Why? Because the conversation shows an attempt by the Trustee to determine the value of

20

the Royalty Interest. The Trustee only knew of the Berg No. 2 well. Mr. Schmitz knew the Trustee was inquiring about the value of the Royalty Interest over the entirety of the Berg Lease. The fact that the Trustee only talked in reference to the Berg No. 2 well is because that's all he then knew about. Mr. Schmitz obviously picked up on that fact and carefully avoided mentioning the other two JRC wells. The Court believes Mr. Schmitz a little disingenuous, duty to disclose or no duty. He admits that the Trustee was asking how he would value the Royalty Interest and, as an experienced oil and gas businessman he knew that one values a royalty interest by looking at the entirety of the lease and not just one well on the lease; however, he scrupulously avoided talking about the two new JRC wells.

The Trustee was perhaps not as diligent as he should have been in this instance. It is likely if he had not contacted Mr. Schmitz, but contacted instead an oil and gas broker or some mineral appraiser, he would have discovered the farm out agreement which would have lead to the discovery that the new wells had been completed and were producing. But, this Court cannot fault the Trustee for attempting to contact HEP, the operator of the one well he did know about, to obtain information through that channel. The Court believes Mr. Schmitz knew the Trustee was asking about the value of the Royalty Interest as it pertained to the entire lease and not just the Berg No. 2 well; therefore, the Court finds that Mr. Schmitz was misleading in the answers he gave to the Trustee. In any event, what is clear is that the substance of the conversation itself created the injustice and gave the Trustee no reason to perform any further investigation.

Regardless, the parties' conversation led to a proposed sale to B-29 which was submitted to the Court by the Trustee and ultimately approved after an auction with the Debtor as the only other bidder. Newly discovered evidence, which came to light as a result of the Trustee's receipt of a royalty check which represented one month's production from the two JRC wells and which equaled

almost 1/3 of the sales price approved by the Court just three days before, proves beyond any doubt that to allow the current Sales Order to stand would be a manifest injustice to the creditors of this case and,  potentially, the Debtor,  and would result in an unjust windfall to B-29 and Mr. Schmitz.

Conclusion

The Trustee has carried his burden to prove the four factors outlined in the *Lavespere* case of the Fifth Circuit and has additionally proven that to allow the Sales Order to stand would be a manifest injustice.

An Order of even date herewith vacating the Sales Order will be entered.